UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES<br><br>v.<br><br>SAMUEL STALIN LEBREAULT<br>FELIZ, a/k/a ANTONIO RODRIGUEZ,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)   Criminal Action No. 13-10171-DJC<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                              January 6, 2014

### I.   Introduction

Defendant Samuel Stalin Lebreault Feliz (a/k/a Antonio Rodriguez) (the "Defendant") is charged in a four-count superseding indictment with passport fraud in violation of 18 U.S.C. § 1542 (2 counts), making false representations to the Social Security Administration in violation of 42 U.S.C. § 408(a)(6) (1 count) and theft of public money in violation of 18 U.S.C. § 641 (1 count). The Defendant seeks to suppress statements that he made to officers of the U.S. Border and Customs Patrol ("BCP") on November 19, 2003 while in secondary inspection from a flight from Venezuela at the Miami International Airport. D. 56. For the reasons stated below, the Court DENIES this motion.

### II.   Relevant Facts

The facts relevant to this motion are not disputed by the parties. On November 19, 2003, the Defendant arrived at the Miami International Airport on a flight from Venezuela. D. 56-2 (Def. Exh. A, Memorandum of CBP Officer Gonzalez). He was traveling under the identity of Juan Antonio Castro Pizarro. During his primary inspection, he informed BCP officers that his

1

true name was Juan Antonio Castro Pizarro and that he was a citizen of the United States born in Puerto Rico. Id. at 1. The Defendant was referred to secondary inspection for further inspection. Id. During this secondary inspection, CBP Officer Madeline Gonzalez ran a NCIC record check and had his fingerprints taken and sent to the Federal Bureau of Investigation in an effort to verify his identity as Juan Antonio Castro Pizarro. Id. The results of these checks were negative, indicating that the Defendant was not the person that he purported to be. Id. Officer Gonzalez asked the Defendant some questions about Puerto Rico, his purported place of birth, which he was unable to answer and he had no other identification on his person or in his luggage. Id. Officer Gonzalez was also aware that had obtained his U.S. passport the previous day and that it was issued for only one month. Id.

After such initial inquiry and investigation, the Defendant was sworn and Officer Gonzalez took a sworn statement from the Defendant in Spanish. Id. The purpose of taking this statement was to determine the Defendant's admissibility to enter the United States. D. 56-3 (Def.'s Exh. B, Sworn Statement of the Defendant) at 1. Officer Gonzalez advised the Defendant of her identity, that she wanted to take his statement "regarding your application for admission to the United States, that he did "not appear admissible or to have the required legal papers authorizing your admission to the United States." Id. She also advised him that "[t]his may be your only opportunity to present information to me and the Immigration and Naturalization Service to make a[n admissibility] decision." Id. Although the Defendant did not receive Miranda warnings, prior to given his statement, Officer Gonzalez informed him that "[i]t is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now

or in the future" and that "[a]ny statement you make may be used against you in this or any subsequent administrative proceeding." Id.

During the course of his sworn statement, the Defendant made several admissions including three statements that the government now seeks to admit at trial in this case: 1) that his true name was not Juan Antonio Castro Pizarro, but instead was Antonio Jose Rodriguez Rodriguez, born in Venezuela on September 13, 1977; 2) that he had used the Pizzaro identity since 1996 when he purchased a Puerto Rican birth certificate and social security card in this identity for $250; and 3) he was aware that it was illegal to enter the United States without proper documentation and that he was committing fraud by attempting to do so with a false identity. Id. at 2-6. During his statement, the Defendant also expressed fear about returning to Venezuela and explained that he came to the United States to his daughters, who were U.S. citizens. Id. at 2, 5. The Defendant later signed his sworn statement. Id. at 7.

As a result of his inspection, including his sworn statement, the CBP detained him "pending a credible fear interview" in regard to any application for asylum. D. 56-2 at 2; D. 56-3 at 7.

### III. Analysis

#### A. *Miranda* Warnings were not Warranted During the Defendant's Secondary Inspection Upon Entering the United States at the Miami International Airport

The Defendant seeks to suppress his statements to Officer Gonzalez on the grounds that she failed to give him Miranda warnings prior to taking his statement. "Miranda warnings must be given before a suspect is subjected to 'custodial interrogation.'" United States v. Taylor, 985 F.2d 3, 7 (1st Cir. 1993) (citing United States v. Maguire, 918 F.2d 254, 262 (1st Cir. 1990)). "Determinations about Miranda custody begin by examining all of the 'circumstances

surrounding the interrogation' and asking whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). In making such determination, it is the objective circumstances of the questioning, not the subjective views of the parties involved that is relevant. Ellison, 632 F.3d at 729. Such further inquiry must be made to determine whether an objective person in the defendant's position would have found the circumstances coercive, "thus raising the concern that drove [the decision in] Miranda." Id. All of this analysis, however, concerns the paradigm of interrogation in the Miranda, "the paradigm example of interrogating a suspect at a police station." Id. But when confronted with a case, like this one, "outside of the Miranda paradigm," "custody under Miranda means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of Miranda." Id.

This is particularly true, as the First Circuit has recognized, in context of customs inspections at a U.S. entry point. In reversing a district court ruling that two defendants were in custody when questioned during a customs inspection while entering the United States from an international flight and therefore were entitled to Miranda warning, the First Circuit ruled that "[i]ndividuals subject to routine traffic stops or customs inspections, circumstances which are not custodial, are rarely free to leave while being questioned by an officer. The relevant inquiry, however, . . . is whether there was an arrest or restrain on freedom of movement of the degree associated with a formal arrest." United States v. Fernandez-Ventura, 85 F.3d 708, 712 (1st Cir. 1996) ("Ventura I"). Upon remand, the district court concluded again that the defendants were in custody and suppressed the statements at issue. Upon further review, the First Circuit concluded that the court had erred again because even as the relevant inquiry must be made in

view of the "totality of the circumstances," it noted that the "most significant circumstance is that this incident occurred in the course of a Customs inspection at our nation's border." United States v. Fernandez-Ventura, 132 F.3d 844, 846 (1st Cir. 1998) ("Ventura II").  Accordingly, "[i]n the context of Customs inspections, our assessment of whether an interrogation is custodial must take into account the strong governmental interest in controlling our borders."  Id. "[Q]uestions from [Customs] officials are especially understood to be a necessary and important routine for travelers arriving at American entry points.  This understanding cuts against the potentially coercive aspect of the Customs inquiry, and lessens the need for Miranda warnings." Id. at 846-847 (quoting Ventura I, 85 F.3d at 711).[1]

    Here, the hallmarks of the questioning to the Defendant were part of a routine inspection at a U.S. entry point designed to determine his admissibility and did not convert the circumstances into an arrest or the equivalent of same such that it could be considered a custodial interrogation for Miranda purposes.  The Defendant was sent to secondary inspection because the CBP had concerns about a "possible false claim" of citizenship. D. 56-2 at 1; see Ventura I, 85 F.3d at 711 (noting that "even secondary inspection does not *per se* constitute custodial interrogation").  Once in secondary inspection, the initial check of his identity (purported to be Pizzaro) against criminal record and fingerprint records were negative, suggesting that he was not the person that he claimed to be.  Moreover, he was unable to answer questions about his claimed place of birth.  Although not given Miranda warnings, Officer Gonzalez warned him before taking his sworn statement that providing false statements or misinformation could lead to

---

[1] Florida v. Royer, 460 U.S. 491 (1983), upon which the Defendant relies, D. 56 at 3-6, does not compel a different outcome.  Although the encounter in Royer also occurred at the Miami International Airport, it did not involve a customs inspection, but inquiry and search of a traveler headed outbound on a domestic flight to New York by police detectives assigned to a narcotics unit, id. at 493-94.  That is, the facts in Royer did not involve the "most significant circumstance" of this incident that it occurred in the course of a Customs inspection at a point of entry into the United States.  Ventura II, 132 F.3d at 846.

criminal or civil penalties. There is no suggestion in the record now before this Court on this motion that the Defendant was handcuffed or otherwise physically restrained or that there were multiple officers involved in taking his sworn statement. Moreover, and significantly, the questions that Officer Gonzalez posed to him when she took his statement related to his admissibility (e.g., true identity; place and date of birth; identity and citizenship of family members, purpose for entering the United States; personal background; prior arrests; prior entries and residences in the U.S. ). Even if some of the Defendant's answers to these questions could also relate to criminal activity (i.e., prior illegal entry into the United States; purchase and use of false identity documents), they also related to his admissibility to enter the United States. Finally, after indicating that he had some fear of being returned to Venezuela, the Defendant was detained by CBP, but was referred for a credible fear interview. D. 56-3 at 7.

The Defendant makes much of the fact that the CBP could have denied the Defendant's admission after the criminal record check and fingerprint record results were negative. In essence, he argues that any further questioning was concerned not with admissibility, but as a means of gathering incriminating statements for later criminal action. First, such contention is belied by the nature of Officer Gonzalez's subsequent questioning which focused on topics related to admissibility. Second, although there was some suggestion by counsel at oral argument that federal agents considered referral, soon after the Defendant's detention by CBP, to federal prosecutors in Miami for possible criminal prosecution, the Defendant was not charged at the time and instead was detained by CBP and referred for a credible fear interview for a possible asylum application. Third, although the negative record checks suggested that the Defendant was not the person he purported to be, the CBP did not yet have complete information

about his true identity and whether there was any basis for his admissibility to enter the United States.

At base, there was nothing to "distinguish this case from a routine Customs inspection so as to support the . . . conclusion that [the defendant was] in custody." Ventura II, 132 F.3d at 848. Since there was no custodial interrogation, Miranda warnings were not required. Accordingly, the Court denies the Defendant's motion to suppress the statements that the government intends to introduce from his November 19, 2003 statement to Officer Gonzalez.

### IV. Conclusion

For the aforementioned reasons, the Court DENIES the Defendant's motion to suppress, D. 56.

**So Ordered.**

/s/ Denise J. Casper  
United States District Judge